**HOLT v. METROPOLITAN REFINING
CO., Inc.
No. 7282.**

District Court, E. D. New York.
Jan. 31, 1935.

Phillips, Mahoney, Leibell & Fielding, of New York City (John F. Robb, of Cleveland, Ohio, of counsel), for plaintiff.

Shapiro, Kolbrener & Schlissel, of Far Rockaway, L. I., N. Y. (William E. Warland, of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This suit is brought on United States registered trade-mark No. 147,024, dated September 27, 1921, of the word "Rust-I-Cide," application for which was filed by The Rusticide Company, an Ohio corporation, on December 16, 1920, and the certificate of registration states continuous use in business since October 8, 1920.

The bill also alleges infringement by defendant of the common-law rights to the trade-mark and for unfair competition by the defendant in using the name "Rust-I-Cide," which forms the essential part of the business name of the plaintiff, and likewise formed essential portions of business names of plaintiff's predecessors to the business of whom he succeeded.

The bill asks for the usual injunction and accounting.

The plaintiff is a resident of the state of Ohio.

The defendant is a New York corporation, which was incorporated about September 30, 1925.

Although there were more defenses pleaded in the answer, the defendant, as ap-

pears by its briefs, relies only on the three following defenses:

"1. There is and has been and can be no confusion between the goods of the plaintiff and the goods of the defendant for the reason that the product sold by plaintiff is an entirely different product than that sold by defendant. The products of the respective parties cannot be used for the same purposes. They do not accomplish the same result. They are merchandised in an entirely different way to entirely different people, through entirely different channels of trade.

"2. The evidence shows that each party knew of the other's product as far back as 1929, and possibly longer. Each party recognized that it could not fill any order that it received for the other's goods and in a few instances where the orders meant for one party were received by the other, the orders were sent to the party who could fill the order.

"3. The word Rust-I-Cide is descriptive, meaning 'to kill rust' or 'rust killer.' It is not the proper subject of a trade-mark and no one can acquire any exclusive rights therein."

The following facts are admitted by the answers to interrogatories:

The defendant admits that within six years prior to the commencement of this suit it applied the notation "Rusticide" to drums containing its rust-removing compound, in the manner depicted by photograph Plaintiff's Exhibit No. 27, and sold in interstate commerce preparations for removing rust in such containers or drums, so marked. The defendant admits its compound is sold as Rusticide, a liquid chemical preparation for removing rust.

Defendant admits that it first learned of the existence of plaintiff and/or his predecessors in business in October, 1929, and at the same time learned of the use by plaintiff's predecessor of the trade-mark "Rust-I-Cide." Also defendant admits knowledge that the notation "Rusticide" was part of the name of plaintiff's predecessors in business, under which name they did business, and that said knowledge was obtained in October, 1929.

Defendant admits that it first received notice from plaintiff of the alleged infringement of plaintiff's registration for trade-mark in suit March 1, 1934, and that it did not acknowledge said notice.

Defendant said that it used its preparation for removing rust only in the interior of pipes where liquid is present.

Defendant said it used only the trade-marks "Rusticide" and "Duboth" upon its rust-removing preparation.

The proofs at the trial showed that defendant employed at least one other trade-mark related to the subject-matter in controversy, namely, "Killrust," registered by defendant February 24, 1925.

The testimony of eight of the plaintiff's witnesses was taken by deposition, only the plaintiff testified orally on his own behalf at the trial.

From all the testimony on behalf of plaintiff it clearly appears that The Rusticide Company commenced business as early as November, 1920, continuing the use of the trade-mark "Rust-I-Cide" actually applied to the goods previously by certain individuals who became members of that company. It also appears that the trade-mark "Rust-I-Cide" was directly applied by labels to the goods, that the trade-mark was effected by an application filed in December, 1920, which resulted in the certificate of registration in 1921, and that the trade-mark as applied to the labels after registration was presented to the public as registered in the United States Patent Office.

It further appears that the said The Rusticide Company continued the business under the said trade-mark until the year 1930, when that company's business, assets, trade-marks, inventory, and obligations were, at a sale in bankruptcy proceedings, taken over by Harvey O. Yoder, and the business continued under the name "Rusticide Products" practically as before, but on a reduced basis, due to the adverse business conditions of 1930 and succeeding years, until 1934, when all of the assets, including good will, business, trade-marks, and registration of trade-marks "Rust-I-Cide" and "Glassobrite" were conveyed to plaintiff, T. T. Holt, who has continued the business since his purchase as aforesaid, up to date, under the name "The Rusticide Products." Orders have been received and filled by this company, operated by the plaintiff, T. T. Holt, in respect to practically all of the states of the Union and in foreign countries. Both Yoder, doing business as Rusticide Products, and T. T. Holt, doing business as The Rusticide Products, have continuously used the trade-mark "Rust-I-Cide" for a rust removing or preventing chemical preparation.

The gross amount of business done by The Rusticide Company and Rusticide Products, between 1920 and 1930, was estimated.

by Mr. Yoder to be between $75,000 and $125,000. The better years were as high as $18,000 or $20,000, and the lower years $6,000.

The plaintiff testified that, since he had taken over the business, he had done approximately $12,000 gross business, and that at the time of giving his testimony he had taken over and was selling about 50 per cent. of the customers that the previous company sold.

The defendant offered evidence that it had since its organization in 1925 done, and is doing, up to the time of the trial, a business in excess of $100,000 a year in selling and servicing of water supply systems, etc., by the use of its composition sold as Rusticide.

On the trial defendant offered in evidence two letters dated February 21, 1933, and March 8, 1933, respectively Defendant's Exhibits E and F, which I received subject to the objection that there was no showing whatever of any authority of the writer to negotiate with the defendant in reference to the business of Rusticide Products, with the statement that, if such authority was not shown, they would not bind.

These letters were written on the stationery of Rusticide Products, but were signed personally by George N. Dobie, who requested that he be addressed at his home 1532 Elmwood avenue, Lakewood, Ohio. The address of Rusticide Products, which company was owned by Harvey O. Yoder, was 5500 Walworth avenue.

The writer of those letters, George N. Dobie, had been one of the organizers of The Rusticide Company, the predecessor of Rusticide Products, but, after Harvey O. Yoder became the owner and continued business under the name Rusticide Products, said Dobie had been simply an employee of Harvey O. Yoder, and had no authority to sell or negotiate for sale of the trade-mark "Rust-I-Cide" or the business connected with it in the years 1930, 1931, 1932, or 1933. This appears from the evidence taken by deposition before the trial, and no evidence was offered by defendant to rebut it.

The letters themselves plainly show that the writer, George N. Dobie, was negotiating personally with the defendant for purposes of personal advancement. They were his letters, not those of the company.

■ The said letters are not binding on the plaintiff or his predecessor.

The defendant offered as a defense prior use, but the use so alleged was use by the defendant, and did not include use by its predecessors. Use by the defendant was what plaintiff prepared to meet, and it was not called upon to meet use by defendant's predecessors.

■ The defense of prior use must be pleaded with sufficient definiteness to apprise the plaintiff as to the use, by whom and when, so that by investigation plaintiff may be prepared to meet it, and a plea of prior use by a corporation organized in 1925 cannot by amendment on the trial be carried back to a use by its predecessor five or six years before that time.

■ The evidence showed that the defendant was not incorporated until 1925, which was long after the registration of the trade-mark owned by plaintiff and its use, and therefore there was no issue tendered as to priority.

Plaintiff is entitled to priority.

In any event, the evidence on behalf of defendant with reference to marking its product with the name "Rusticide" is not of the character required to convince me that defendant marked its product with the name "Rusticide" from a date as early as 1925.

■ The contention of defendant that it could prove prior use by the predecessors of defendant under the following allegation of the answer: "The mark or name Rusticide has been used in various States of the United States for many years since October 8, 1920, by persons unassociated with the plaintiff or his predecessors in interest with the knowledge of the plaintiff and his predecessors," is without merit as October 8, 1920, is a date when plaintiff's predecessor certainly used the trade-mark, and any use subsequent to that time would not be prior use.

■ In passing, I would say that there is no defense proven under that allegation, as the trade-mark "Rust-I-Cate" was registered January 22, 1929, and the trade-mark "Rust-I-Cide" was registered August 12, 1930, for Ready Mixed Paint, Varnish, Stains and Paint Enamel, both long after plaintiff's, and there was no proof of their use even if such defense was allowable. The word "Cide" registered before plaintiff's was not in any sense the same or so similar that there would be confusion.

Defendant was not present in person or by counsel on taking plaintiff's depositions, and, when they were offered, defendant took objection generally to so much of them as

were hearsay, and the court said it would rule on such portions as were pointed out in defendant's memorandum as hearsay.

No particular answers have been pointed out as hearsay in the defendant's memorandum, but defendant has contented itself with citing certain pages on which some of the answers with reference to the particular matter are clearly not hearsay; therefore no ruling is made as the particular answers are not pointed out.

In my findings of fact, however, I have not based them on any evidence which I considered hearsay, nor is it necessary, as the letters in evidence between the plaintiff and predecessor of plaintiff, and defendant, in 1932, 1933, and 1934, show confusion on the part of the public.

The plaintiff owns a valid trade-mark "Rust-I-Cide" registered September 27, 1920, which he and his predecessors have used continuously since October 8, 1920, and the word "Rusticide" has formed a part of the names under which plaintiff and his predecessors have manufactured and sold merchandise under said trade-mark.

This brings us to a consideration of the defenses urged by defendant.

■ Let us first consider the defense that there is, and can be, no confusion between the goods of the parties. Defendant contends, and the evidence on behalf of plaintiff shows, that plaintiff marks its bottles, containers, etc., in which it sells its product, with the word "Rust-I-Cide" in white letters on a black background, and the word and black background are surrounded by an eliptical line with red both above and below the word "Rust-I-Cide" as typified by Defendant's Exhibit A and Plaintiff's Exhibit No. 17. And also that plaintiff sells its product at retail to hardware and paint stores, gasoline stations, etc., and in glass containers and in wood containers holding five gallons, ten gallons, half barrels, and full barrels; the trade-mark such as shown on Plaintiff's Exhibit No. 17 being used on all such containers. And, further, that plaintiff advertises his goods in various magazines and national trade papers.

Defendant on the other hand contends that defendant does not advertise in any magazines or papers of any kind, and no competent evidence of any kind was offered to the contrary.

Defendant also contends that not one of its representatives ever advertised it, but there is no positive evidence on that point,

as Mr. Edwards, president of the defendant, testified only that he did not know of any representative who ever advertised their product.

Mr. Edwards said that defendant does not sell its product as a product, but what it sells is a service; so advertising the product would not do any good, and it would have to advertise in connection with a service.

While the advertisement alleged to have been published by Ernst Hardware Company was not sufficiently proved to be admitted in evidence, and while Mr. Edwards says that the defendant did not sell Rusticide to the Ernst Hardware Company, the defendant did sell to it drainpipe solvents.

The plaintiff did and does have business with industrial plants, in reference to plaintiff's Rust-I-Cide trade-mark, and plaintiff's business relation with industrial plants was clearly shown to be among the outlets for the sale of its product Rust-I-Cide.

Mr. Edwards testified that the sale by defendant of its product to industrial plants was one of the outlets.

From this it appears that the customers of plaintiff and defendant include the same class of purchasers.

Plaintiff's product is a chemical preparation for removing rust from metal parts by application thereto externally, and, where said parts are inclosing parts, by application thereto internally.

Defendant's product is the same class of goods as plaintiff's, and would be classified in the same class, to wit, class 6, chemicals, medicines, and pharmaceutical preparations, if it could be registered in the United States Patent Office, under the Federal Trade-Mark Act 1905, § 1 et seq., as amended (15 USCA § 81 et seq.), and is a chemical preparation for removing rust from metal parts, confessedly used by application to the interior of enclosing metal parts such as pipes.

The chemical constituents of plaintiff's and defendant's products are different, and to a large extent defendant uses its preparation in a different way, or with a different mode of application to the metal parts; nevertheless confusion has been proved to exist.

The name "Rust-I-Cide" is a fanciful or arbitrary mark.

■ Even if there was no proof of confusion, where a fanciful or arbitrary trade-mark or notation is adopted by plaintiff in the manner presented in this case, and defendant adopts the same as in this case, and

the uses of the two compounds are for the same class of work, i. e., removal of rust, and there was no reason why defendant should have selected the same arbitrary name as plaintiff, in such a case any possible doubt of the likelihood of damage should be resolved in favor of plaintiff. Lambert Pharmacal Co. v. Bolton Chemical Corporation (D. C.) 219 F. 325.

█ The right in a trade-mark notation is not confined to the use of the trade-mark particularly upon the same class of goods. Aunt Jemima Mills Co. v. Rigney & Co. (C. C. A.) 247 F. 407, L. R. A. 1918C, 1039; Yale Electric Corporation v. Robertson (C. C. A.) 26 F.(2d) 972; Wall v. Rolls-Royce Co. of America (C. C. A.) 4 F.(2d) 333; Gilbert Co. v. John C. Gilbert Chocolate Co. (Cust. & Pat. App.) 48 F.(2d) 930; Ralston Purina Co. v. Saniwax Paper Co. (D. C.) 26 F.(2d) 941.

In Aunt Jemima Mills Co. v. Rigney & Co., supra, the defendant used the trademark "Aunt Jemima" for pancake syrup, which trade-mark had been previously registered for flour.

In Yale Electric Corporation v. Robertson, supra, the plaintiff used the word "Yale" upon many sorts of hardware, especially upon locks and keys, but not upon electric flash-lights and batteries, which was the use to which it was put by defendant. Defendant held not entitled to register, and the Circuit Court of Appeals of this circuit, by Circuit Judge Learned Hand, at page 974 of 26 F.(2d), said: "And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."

In Wall v. Rolls-Royce Co. of America, supra, the defendant used the trade-mark "Rolls-Royce" for radio tubes, whereas the trade-mark of the plaintiff which was protected was a trade-mark and notation owned by an automobile manufacturer.

In Gilbert Co. v. John C. Gilbert Chocolate Co., supra, a case for trade-mark infringement, it was held that medicated chewing gum was a product of the same descriptive properties as chocolate candy.

In Ralston Purina Co. v. Saniwax Paper Co., supra, it was held to be infringement to use a trade-mark on paper bread wrappers, which trade-mark had been registered for flour.

Defendant cites in support of its contention France Milling Co. v. Washburn-Cros-

by Co. (C. C. A.) 7 F.(2d) 304; Beech-Nut Packing Co. v. P. Lorillard Co. (C. C. A.) 7 F.(2d) 967, affirmed 273 U. S. 629, 47 S. Ct. 481, 71 L. Ed. 810; White Rock Mineral Springs Co. v. Akron B. & C. S. Co. (C. C. A.) 299 F. 775; Mason, Au & Magenheimer C. Co. v. Loose-Wiles Biscuit Co. (D. C.) 1 F. Supp. 755. These cases, in my opinion, are not in point, but are clearly distinguishable.

In France Milling Co. v. Washburn-Crosby Co., supra, the facts are so different, and the acquiescence by the Washburn-Crosby Company, which had sold for years to France Milling Company under its trademark "Gold Medal" the plain wheat flour from which France Milling Company, to its knowledge, had manufactured the pancake and buckwheat flour which it sold under the mark "Gold Medal," is so plain, that I do not see how it can be controlling in this suit.

In Beech-Nut Packing Co. v. P. Lorillard Co., supra, the plaintiff used the mark "Beech-Nut" on food supplies of various kinds, while the defendant used it on tobacco and cigarettes. The use of the mark in that case is clearly distinguished from that in this suit, where both plaintiff and defendant use it on rust remover.

In White Rock Mineral Springs Co. v. Akron B. & C. S. Co., supra, the plaintiff used the words "White Rock" on mineral water and ginger ale. Defendant used for fifteen years and registered "White Rock" for beer, malt extract, and liquors. After and during prohibition defendant used the word on near beer, a soft drink. Plaintiff opposed defendant's registration for "White Rock" but did not appeal from the decision. The court held that plaintiff had acquiesced in the use of the same mark by defendant for substantially the same class of goods, and dismissed the bill.

There has been no such acquiescence in this suit.

In Mason, Au & Magenheimer C. Co. v. Loose-Wiles Biscuit Co., supra, the use of the word "Trumps" on cookies was held not to infringe the use of the same word on confectionery. This clearly is not authority for the use of the plaintiff's mark by the defendant in this suit, where the mark is used by both parties on a rust killer or rust remover.

Defendant had other trade-marks, and the word "Rusticide" did not form any part of its name, therefore it must have believed it would gain some distinct benefit by its use, and since 1929, at least, defendant has

been using the name with full knowledge of the rights of the plaintiff. The defendant likewise must have known that the owner of said trade-mark had not given and did not intend to give to the defendant any right to use that trade-mark.

This it seems to me is clearly shown by the letters of Dobie, offered in evidence on behalf of defendant, because, although he was unauthorized by the owner of the trade-mark to write the letters in question, and really wrote them to assist himself, he obviously was seeking to ingratiate himself with the defendant by suggesting the possibility that with his assistance the trade-mark could be acquired.

I do not believe that it makes any difference under the Trade-Mark Law that there is a difference in the constituents of the respective products of plaintiff and defendant, and we must not lose sight of the fact that defendant's witnesses testified that the varying constituents of the defendant's products, as to percentage at least, were changed to fit each service as might be determined to be necessary. Neither do I believe that it makes any difference under the Trade-Mark Law that the defendant uses it internally in pipes and other containers with water, and plaintiff uses its product for removing rust from parts to which the product is applied externally, and in some instances internally:

In any event, the plaintiff's product is used by at least one very large company internally to remove rust from coils and receivers and tanks; the plaintiff's Rusticide product being introduced into those inclosing parts.

The fact is that both plaintiff's and defendant's products are chemical preparations for the removal of rust.

The contention of defendant that its product is used in water systems to remove discoloration of the water and not to remove rust does not convince me that the facts are different than I have stated, because the discoloration of the water in question is caused by rust, and, when the rust is removed, the water ceases to be discolored; therefore what defendant accomplishes with its product is what plaintiff accomplished, to wit, remove rust.

This it seems to me appears very clearly by a comparison of Plaintiff's Exhibit No. 21 (an old price list of about May 5, 1926, and a circular of the original The Rusticide Company) with defendant's circulars Plaintiff's Exhibit No. 28, first, the circular entitled "Rust's Greatest Enemy—Rusticide"; second, the small circular, page 2, and the last page.

The limitation which defendant seeks to impose on plaintiff's trade-mark is not sustained by authority; on the contrary, as I understand it, the law is that a trade-mark owner is entitled to protection, not only for his trade-mark, as applied to the general type of goods in connection with which it is used, but such owner has a right to be protected against the use of his trade-mark in a field which naturally is within or to which his business may naturally extend. L. E. Waterman Co. v. Gordon, 72 F.(2d) 272, 273, in which case the manufacturer of fountain pens under a trade-mark objected to the use of the trade-mark on razor blades, and the Circuit Court of Appeals of this circuit, by Circuit Judge Learned Hand, said: "A trade-mark protects the owner against not only its use upon the articles to which he has applied it, but upon such other goods as might naturally be supposed to come from him."

It does not seem to me that the amount of business conducted by the defendant gives it any greater right to infringe than a man conducting a small business would have. On the contrary, the larger the business carried on by the defendant, the greater the damage which plaintiff suffers.

It clearly appears from the evidence of defendant's expert that plaintiff's product is not the same as the product of Dr. Allen, patented under No. 1,329,573 and issued February 3, 1920, but has been changed and is still a product to remove rust.

Defendant contends that plaintiff's predecessors acquiesced in the use of the name "Rusticide" by defendant, but that contention is not sustained.

Plaintiff's predecessors had actively pushed the sale of their product "Rust-I-Cide," and it was well known on the market, its sale having been made in a wide area, and, if defendant was actively pushing the use of its service and product, it should have heard of plaintiff's product; but, as defendant was not advertising, plaintiff's predecessors undoubtedly had not heard of defendant's use of the name "Rusticide" before 1929, and at that time, in all reasonable probability, there was no confusion.

In 1929 The Rusticide Company lacked funds due to the slump in building, and would not have been able to prosecute an ac-

tion for infringement. Conditions grew worse with The Rusticide Company, until in 1930 the company found itself in the bankruptcy court.

The trade-mark and other assets of The Rusticide Company were purchased by Mr. Yoder, but the business conditions were such that he could not prosecute an action for infringement.

In 1932 and 1933 the letters between the parties show that there was confusion on the part of the public. Plaintiff purchased in January, 1934, and shortly thereafter he learned of the confusion.

Plaintiff wrote defendant a letter with reference to defendant's use of the name "Rusticide," which defendant did not answer, and plaintiff, to protect his rights, commenced this action on the 14th day of June, 1934.

There was no estoppel.

Defendant did not allege or prove any intervening rights.

Surely the financial conditions of the years from 1929 to 1934 furnish a sufficient excuse for the failure of The Rusticide Company and Mr. Yoder to commence an action for infringement, and there can be no complaint of any long delay on the part of the plaintiff, and, further, the evidence of confusion increased, which also furnished a good reason for the plaintiff to believe such confusion did and would damage the plaintiff.

The first defense which we have discussed is not sustained.

The second defense, as I understand it, is that plaintiff's predecessor consented to the use of the name "Rusticide" by defendant, and that there was a working agreement between them.

I can find no consent or working agreement.

In addition to what I have hereinbefore written, the following establish that there was no consent or working agreement.

The letters between plaintiff's predecessor and defendant were prompted simply by business honesty in sending to another a letter which was intended for him or it.

There was no consideration of any kind for any consent by plaintiff's predecessor, and there were no mutual dealings in the form of sales or purchases, and there is no evidence of consent or working agreement.

■ Much more than a mere exchange of common courtesies is required. McLean v.

Fleming, 96 U. S. 245, 257, 24 L. Ed. 828; Aunt Jemima Mills Co. v. Rigney & Co., supra; H. A. Metz Laboratories, Inc., v. Blackman, 153 Misc. 171, 275 N. Y. S. 407; Menendez v. Holt, 128 U. S. 514, 521, 9 S. Ct. 143, 32 L. Ed. 526.

In McLean v. Fleming, supra, the Supreme Court, by Mr. Justice Clifford, at page 257 of 96 U. S., said:

"Negotiations took place at one time between the respondent and one of the predecessors of the complainant for an interchange of commodities, with a view that both commodities might be sold at each of their respective places of business.

"Evidence of a decisive character is exhibited in the record to show that the complainant or his predecessor knew throughout what description of labels and trade-marks the respondent was using; and it does not appear that any objection was ever made, except as heretofore stated and explained. Once, the respondent was requested to insert the initials of his Christian name before his surname, in the label; and it appears that he immediately complied with the request."

Notwithstanding such actions of the trade-mark owner, the injunction was granted.

In Aunt Jemima Mills Co. v. Rigney & Co., supra, the owner or first user of the trade-mark wrote a letter to the alleged infringer suggesting its surprise at the adoption of the name "Aunt Jemima for your syrup, but presume you can do so without violating any law in the matter." Notwithstanding such letter, the infringer was enjoined.

In H. A. Metz Laboratories, Inc., v. Blackman, Inc., supra, the court said (page 419 of 275 N. Y. S.): "Before the doctrine of laches will be applied, there must exist more than the mere lapse of time."

In Menendez v. Holt, supra, the Supreme Court, by Mr. Justice Fuller, at page 523 of 128 U. S., 9 S. Ct. 143, 145, said: "The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it." And no estoppel arises.

The cases cited by defendant are not in point.

In the case of William H. Keller, Inc., v. Chicago Pneumatic Tool Co. (C. C. A.) 298 F. 52, the name "Keller" was not a registered trade-mark. The defendant spent

$50,000 in marking its products and in "notifying the trade its products were not made by appellees," and to prevent confusion. Agreements of Julius Keller were not binding on the defendant William Keller. The complainant, with knowledge of defendant's use, wanted defendant to act as agent and agreed to give it, as agent, commissions on sales. A condition such as that involving the second letter of May 21, 1918, quoted in the decision, is not present here. The Keller Case embodied important equities not found in the instant case.

In the case of Whittemore Bros. Corporation v. Ramsey (D. C.) 300 F. 576, it was held that the plaintiff had not established its priority over the defendant's predecessors, and there had been a delay of twenty years.

In the case of Popular Mechanics Co. v. Fawcett Publications (D. C.) 1 F. Supp. 292, a motion for a preliminary injunction was denied where there had been four years' delay in bringing suit, and there was a question as to the right of the defendant to use similar words to the name already registered. This is clearly distinguishable from the instant case, where delay, if any, is explained. The word used is exactly the same.

In the case of Coca-Cola Co. v. Carlisle Bottling Works (C. C. A.) 43 F.(2d) 119, the court held that the mark "Roxa Kola" did not infringe the trade-mark "Coca Cola," and where, after communicating with defendant as to the use of the name, plaintiff remained silent for three years upon defendant's assurance that it would discontinue the practice of substituting its product for the plaintiff's, and that it would use its best efforts to discourage the dealers in so doing, there was acquiescence.

This defense is not sustained.

This brings us to the last defense urged by defendant in its brief, that the word "Rust-I-Cide" is descriptive, meaning "to kill rust," or "rust killer," and that it is not the proper subject of a trade-mark, and no one can acquire any exclusive rights therein.

This was a last minute defense, unsupported by any evidence.

The whole defense rests upon argument, which to me is not convincing.

It is unnecessary to review the various cases cited by the defendant and the names which were held to be descriptive in those cases, as I am convinced that the word "Rusticide" is an arbitrary word, and is not descriptive of the ingredients, qualities, or characteristics of the article on which the trade-mark is used. I know of no successful attack ever having been made on the word "Herpicide" as a trade-mark, on the ground of descriptiveness, and "Rusticide" is certainly no more descriptive than "Herpicide."

This defense is not sustained.

Unfair competition is shown.

The defendant in the use of the word "Rusticide" is not only using the plaintiff's trade-mark, but also a word that has, from the beginning, formed part of the name under which plaintiff and his predecessors have marketed their product. American Steel Foundries v. Robertson, 269 U. S. 372, 46 S. Ct. 160, 70 L. Ed. 317.

Aside from the rights under the registration, plaintiff by continuous use of the word "Rusticide" by his predecessors and himself, from 1920 right down to the day of this trial, has established common-law rights to the mark, and the common-law rights of the plaintiff have been infringed by the defendant.

A decree may be entered in favor of the plaintiff against the defendant, with injunction, accounting, costs, and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided in rule 70½ of the Equity Rules (28 USCA § 723) and rule 11 of the Equity Rules of this court.